Hearing:
November 18, 2003

THIS DISPOSITION
**IS CITABLE**
AS PRECEDENT OF THE TTAB

Mailed:
March 31, 2004
Paper Nos. 33
Bucher

**UNITED STATES PATENT AND TRADEMARK OFFICE**
_____

**Trademark Trial and Appeal Board**
_____

Jacob Zimmerman

v.

National Association of Realtors

_____

Cancellation No. 92032360
against Registration No. 0515200
Cancellation No. 92040141
against Registration No. 0519789,
_____

David Barry of Barry & Associates for Jacob Zimmerman.

Jeffrey A. Handelman and Jerome Gilson of Brinks Hofer
Gilson & Lione for National Association of Realtors.
_____

Before Cissel, Bucher and Rogers, Administrative Trademark
Judges.

Opinion by Bucher, Administrative Trademark Judge:

The registrations involved in these proceedings are

for the collective marks REALTOR[1] and REALTORS.[2]  The

_____

[1]     Registration No. 0519789 issued on January 10, 1950,
renewed.  In the application for this registration, respondent's
predecessor indicated that it was exercising legitimate control
over use of this mark for the recited services, which read as
follows:  "brokerage of real estate, industrial brokerage, farm
brokerage, mortgage brokerage, in the appraisal of real estate,
management of real estate, in the building of structures on real
estate, in the subdivision of real estate properties, and in

record reveals that the National Association of Realtors (hereinafter "NAR" or "respondent") is the nation's largest professional association, having an affiliation with more than 1500 local and state associations. Additionally, more than 760,000 individual real estate professionals use respondent's registered marks to identify their membership with respondent.

Jacob Joseph Zimmerman ("petitioner" herein) seeks cancellation of these two registrations held by NAR based upon his allegations that the registered marks are generic. At the time the record in this case closed, Zimmerman had recently completed his undergraduate degree in the School of Hotel Administration at Cornell University in Ithaca, NY. His business dealings relevant to the current proceeding were directed largely to real estate agents and involved the marketing of domain names and a range of Internet-related services including website design and hosting, providing central databases for real estate listings, offering banner ads and other online advertising, and the like.

---

community planning for the development of raw land and slum clearance areas."

[2]   Registration No. 0515200 issued on September 13, 1949, renewed. The recitation is the same as in Reg. No. 0519789.

## The Pleadings

In his petitions for cancellation, petitioner asserts that he is "in the business of buying and selling website addresses containing the word 'realtor' and 'realtors'… " and that he "owns approximately 1900 web site names incorporating the term 'realtor' and 'realtors' and a geographic designation."  (Petitioner's petitions for cancellation, ¶¶6 & 7)  He asserts that respondent's registered marks are generic because, in common parlance, the words "realtor" or "realtors" are synonymous with real estate agent or real estate agents.  He alleges that respondent's registrations and trademark policies preclude him from offering his websites to real estate agents:

> Petitioner has been injured in his business by the continuance of the registration of the "realtors" mark.  Potential purchasers of petitioner's web site are mainly real estate agents.  Many such realty agents are aware of NAR's threats to file suit against any person using the term "realtors" in web site names, and are therefore unwilling to purchase any of petitioner's web site names.  In addition, realty agents are unwilling to pay petitioner for placement on such web sites as *bostonrealtors.org* because of the threat by NAR to enjoin the use of such web site names.  NAR's continuing registration of the "realtors" mark has severely lowered the demand for petitioner's web site names and petitioner's promotional services.

(Petitioner's petitions for cancellation, ¶9)

In its answer, respondent denies the essential allegations of the petitions except that it admits that real estate agents who are members of respondent are authorized to use the "Realtor marks" in accordance with specified terms and conditions, and notes that even members of NAR are subject to respondent's rules and guidance about using its REALTOR marks within Internet domain names.

## The Record

The record in the instant case includes the pleadings, the files of the involved registrations, and respondent's notice of reliance on the discovery deposition of Mr. Zimmerman and related exhibits. In addition, the parties have stipulated that the entire record created in connection with two earlier consolidated proceedings (the "Freeman" case) would be included as part of the record in this proceeding.[3] This evidentiary record from the Freeman action includes the deposition testimony of Ms. Freeman, the plaintiff in the prior proceeding; the affidavit of Michael R. Thiel, respondent's Associate Counsel in the Legal Affairs Division, with related exhibits; the

---

[3] Cancellation No. 92028047 against Reg. No. 0515200 and Cancellation No. 92027885 against Reg. No. 0519789, captioned *Arleen Freeman v. National Association of Realtors*, 64 USPQ2d 1700 (TTAB 2002). These earlier combined proceedings were

affidavit of Nicholas G. De La Torre, an attorney for respondent, with related exhibits; the affidavit of Clifford D. Niersbach, respondent's Vice President responsible for the Board Policy and Programs Division, with related exhibits; the discovery deposition of Dr. Michael Sullivan, petitioner's survey expert, with related exhibits including his earlier affidavit in support of the survey; the discovery deposition of Kristin Gismervik (nee Shapiro), who works for Dr. Sullivan; the declaration of Robin McCoy, who also works for Dr. Sullivan; the declaration of David Barry, petitioner's attorney, with extensive exhibits; the declaration of Dr. Ivan Ross, respondent's survey expert, with related exhibits; the declaration of Dr. Jacob Jacoby, another of respondent's survey experts, with related exhibits; and the affidavit of Jon Krehbiel, New York Operation Manager for Electronic Evidence Discovery, Inc.

The issues have been fully briefed by both parties, and both parties were represented at an oral hearing held before the Board. We find that petitioner has failed to show that the terms "Realtor" and "Realtors" are generic terms for real estate agents.

---

dismissed with prejudice based upon the doctrine of licensee

As a preliminary matter, we find it useful to clarify our understanding of the meaning of the parties' stipulation that "the admissions of the parties [in the previous proceedings] … shall be binding on the parties in the present proceedings."[4]  While any factual admission the previous plaintiff (a real estate agent) may have made about matters relating only to herself clearly would not be admissible or relevant as applied to the current petitioner (an entrepreneur with various business interests on the Internet), it seems clear under this stipulation that any admissions the previous plaintiff made about NAR, the use of the involved terms, and the like, are binding on the current petitioner.  Likewise, any admissions NAR made about itself, its operations, its use of the involved terms, etc., in the previous proceeding, are binding upon NAR in this proceeding.  This includes admissions of any type, whether they came into the record through the pleadings or as admissions under Rule 36 placed into the

---

estoppel.
[4]     "5.   All of the evidence submitted in Cancellation No. 27,885 and 28,047 shall form part of the record in the present proceedings and the admissions of the parties in Cancellation No. 27,885 and 28,047 shall be binding on the parties in the present proceedings."
      We also note that the same counsel represented the previous plaintiff as well as the current plaintiff.

record by notices of reliance.  See Fed. R. Civ. P. 36 and
37 C.F.R. §2.120(j).

## Summary of Arguments

Petitioner argues that clear and convincing evidence
shows that the primary significance of the terms "Realtor"
and "Realtors" is as generic terms for real estate agents.
In response, respondent contends that its registered
collective marks are distinctive, not generic.  Respondent
contends that petitioner's evidence shows occasional
careless misuse of its registered marks in publications,
for example, as well as some usages that are ambiguous, but
that many more publications show proper use of its
collective marks, i.e., the publications recognize the
terms as marks.

According to one dictionary entry, the term "Realtor"
was coined in 1916 by Mr. Chadbourn, a writer in the
National Real Estate Journal.  Of course, petitioner's own
source shows that Chadbourn, the first proponent of this
term, saw it functioning as a collective mark – in short, a
proprietary term to distinguish members of the national
real estate association from nonmembers.

In support of petitioner's claim that this term has
been generic since the 1920's, petitioner points to

- 7 -

Sinclair Lewis' satirical 1922 novel <u>Babbitt</u>, wherein the main character, George F. Babbitt, is a real estate agent who takes the position that the term should be applied generally to members of the real estate profession. Petitioner argues that on the heels of this widely read novel came decades in which numerous court decisions – published federal court decisions including those of the U.S. Supreme Court – and dozens of general circulation publications used the term generically to refer to real estate agents.

Finally, while petitioner argues that members of the general public make up the relevant universe for our determination, respondent would have us find that real estate professionals are the correct universe for determining customer perceptions.

## Decision and Analysis

Under the circumstances, we deem admitted, *inter alia*, the fact that respondent's two registered marks involved herein are categorized as collective marks. Freeman Response to NAR's Request for Admission No. 23. However, one need not rely on earlier admissions to establish this. In identifying the targeted registrations, the pleadings of

the current petitioner also contain allegations that the involved registrations are for collective marks.

Yet in its prosecution of these proceedings, petitioner has largely ignored the fact that these marks are collective marks of any kind. Petitioner's counsel shoehorns these marks into the general category of trademarks, while its survey asks whether consumers view the word "Realtor" as a "brand name."

Respondent quite correctly takes issue with these characterizations by petitioner. On the other hand, respondent has variously referred to its marks as "collective marks," "collective membership marks" and "collective service marks."

We find that respondent is clearly a collective entity, eligible to own a "collective mark" as defined in §45 of the Lanham Act, 15 U.S.C. §1127. Its applications were filed by respondent's predecessor soon after the Lanham Act was enacted (which legislation first permitted registrations by the owners of collective marks) and asserted that respondent's predecessor was exercising

legitimate control over the use of the marks in commerce by its members.[5]

In fact, there are indications in this record that respondent has long *considered* these to be collective *membership* marks.[6] In the context of this collective, the purpose of a collective membership mark would be merely to indicate that the user of the mark is a real estate agent who is a member of the collective organization and who has met NAR's standards for admission. The original specimen in the REALTORS application was a window decal demonstrating that the

---

[5] The text of the original application papers claimed that the "NATIONAL ASSOCIATION OF REAL ESTATE BOARDS … has adopted and is exercising legitimate control over the use of the collective mark shown in the accompanying drawing for [services in connection with] the brokerage … [management, appraisal and planning services]… and presents herewith five specimens showing the collective mark as actually used in connection with such services and the advertising thereof by members of such organization: the service mark being used by members of the organization by applying a decalcomania containing the mark to the window or wall of the office in which such service is performed, by placing the mark upon a plaque displayed in said office, by printing the mark on stationery and advertisements of such members, and by wearing a button upon which the mark appears as an indication of membership in such association …."

[6] Collective membership marks may be owned by collective organizations that never use the symbols of their organizations in connection with the commercialization of goods or services, such as fraternal benefit societies. *See Ex Parte The Supreme Shrine of the Order of the White Shrine of Jerusalem*, 109 USPQ 248 (Comm'r. Pat. 1956).

real estate agent displaying this sign was a member of the "National Association of Real Estate Boards."

While our decision herein would be no different even if we were to accept respondent's argument that its mark should be viewed solely as a collective membership mark, the weight of the evidence supports the conclusion that respondent's marks are, consistent with the way the United States Patent and Trademark Office has long classified them, collective *service* marks.[7] Beginning with the filing of the original applications for the REALTOR and REALTORS marks, respondent (and its predecessor) have consistently emphasized the brokerage, management, appraisal and planning services offered by its members. This usage demonstrates the availability of real estate services offered by respondent's members, or collective *service* mark usage.

In making a determination on the question of genericness, we are seeking to discover the perceptions of

---

[7] In its 1989 renewal application, with papers having a prominent heading of "U.S. Class 200" (collective *membership* mark), respondent claimed that "[t]he mark shown in said registration is still used in interstate commerce by members of [the] registrant in connection with brokerage …." Consistent with its earlier classification, the United States Patent and Trademark Office approval continues to shows this as a collective *service* mark, classified in "International Class 36, U.S. Class 102."

consumers. As Judge Learned Hand observed in *Bayer Co. v. United Drug Co.*, 272 F 505, 509 (SDNY 1921), "the question is whether the buyers merely understood that the word 'Aspirin' meant this kind of drug, or whether it meant that and more than that: i.e., that it came from the single, though, if one please anonymous, source from which they had got it before." However, a critical area of disagreement between the parties to these proceedings is defining the "buyers," i.e., the relevant group of purchasers herein. Petitioner, focusing on the services offered by respondent's member agents, considers purchasers of real estate services to be the critical group. Respondent, focusing on use of its marks to indicate membership in respondent, considers real estate agents and brokers to be the critical group.

Clearly, when dealing with ordinary consumer goods or services, the test for genericness is the term's meaning to consumers, not necessarily the professionals in the trade.[8]

---

[8]     Our principal reviewing Court held that under the 1984 amendment to the Lanham Act, the test of whether "touchless" is a trademark for auto washing services or is the generic name of a type of auto wash service is its meaning to consumers who use the services, not solely to operators and manufacturers of auto wash equipment. *Magic Wand, Inc. v. RDB, Inc*., 940 F.2d 638, 19 USPQ2d 1551 (Fed. Cir. 1991). *See also In re Northland Aluminum Products, Inc*., 777 F.2d 1556, 227 USPQ 961 (Fed. Cir. 1985) (when the issue is genericness to the consuming public, evidence

However, in the instant case, we are not dealing merely with ordinary consumer goods or services. Rather, in this case, the record shows that we are faced with two distinct populations of persons whose perceptions may well be quite different. While any member of the general public who is in the market for real estate would be a prospective consumer of the listed "brokerage services," it is also clear that in the context of collective service marks, the members of the real estate profession – i.e., those who are eligible for membership in respondent – are a distinct population whose perceptions also are critical herein.

The statutory basis for canceling the registration of a generic term is found in §14(3) of the Lanham Act, 15 USC § 1064(3). As our principal reviewing court has stated:

> …[D]etermining whether a mark is generic … involves a two-step inquiry: First, what is the genus of goods or services at issue? Second, is the term sought to be registered … understood by the relevant public primarily to refer to that genus of goods or services?

*H. Marvin Ginn Corporation v. International Association of Fire Chiefs, Inc.,* 782 F.2d 987, 990, 228 USPQ 528, 530 (Fed. Cir. 1986). The critical issue (both before and

---

that professionals view the term as a trademark is not probative).

after the 1984 Trademark Clarification Act) in genericness cases is whether members of the relevant public primarily use or understand the term sought to be registered to refer to the genus or category of goods in question. *In re Montrachet S.A.*, 878 F.2d 375, 376, 11 USPQ2d 1393, 1394 (Fed. Cir. 1989): *In re Merrill Lynch, Pierce, Fenner, & Smith, Inc*., 828 F.2d 1567, 1570, 4 USPQ2d 1141, 1143 (Fed. Cir. 1987); *Dan Robbins & Assocs., Inc. v. Questor Corp*., 599 F.2d 1009, 1014, 202 USPQ 100, 105 (CCPA 1979); and *In re Recorded Books, Inc.,* 42 USPQ2d 1275 (TTAB 1997). Evidence of the relevant public's perception of a term may be obtained from any competent source, including newspapers, magazines, dictionaries, trade journals, catalogs and other publications. *In re Leatherman Tool Group, Inc*., 32 USPQ2d 1443, 1449 (TTAB 1994), citing *In re Northland Aluminum Products, Inc*., *supra*. Finally, we note that in the context of these *inter partes* proceedings, it is petitioner's burden to prove the genericness of these terms by a preponderance of the evidence. *Magic Wand Inc. v. RDB Inc*., *supra*.

With respect to the first part of the *Marvin Ginn* inquiry, the genus of services is largely described by respondent's chosen recitation in the context of the

original application papers.  Accordingly, we find that the genus of services is real estate brokerage, management, appraisal and planning services involving buildings and land, as delivered by members of a professional association.

There was a fairly extensive record developed during these proceedings, and we review the principal categories of evidence offered as probative in answering the second question posed by the *Marvin Ginn* analysis of genericness.[9]

### (1)  Uncontested Generic Use By Competitors

The only evidence in this record as to competing associations of real estate professionals is the indication that the National Association of Real Estate Brokers identifies its members as "Realtists."

Moreover, when respondent's member organizations, member agents or member brokers terminate their membership with respondent, they must discontinue any use of the REALTOR marks.  To the extent that individuals or local real estate groups misuse these registered terms, the previous litigation with Ms. Freeman illustrates the extent of respondent's policing efforts with respect to such uses,

---

[9]    See J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition §12.13 (4th ed. December 2003).

demonstrates that respondent does not permit such uses to go uncontested, and shows that respondent continually takes affirmative steps to emphasize the proprietary status of its collective service marks. In short, the record shows no evidence of generic use of REALTOR or REALTORS by competitors.

**(2) Generic Use By the Trademark Holder**

Similarly, in this most extensive record, petitioner has not alleged, nor have we discovered, any instances where respondent has used its claimed identifiers in a generic manner. In fact, in hundreds of pages of marketing and promotional materials put out by respondent and respondent's member associations, the materials consistently use the marks REALTOR® and REALTORS® in a manner consistent with the proprietary nature of these marks. Respondent issues guidance containing specific rules for "use of the REALTOR® marks and name." This guidance outlines limitations on the use of the REALTOR marks and logo and provides graphic representations of correct and incorrect uses of the logo, in print, in advertisements and on the Internet. For the benefit of its member associations and individual agents and brokers, its webpages contain "Graphics Standards and Style Guidelines."

Accordingly, we find no evidence of generic use by respondent.

### (3)  Dictionary Definitions

While petitioner argues that "the Oxford English Dictionary entries [show] historical generic use," respondent points to a long list of dictionary definitions that show the proprietary nature of the term "Realtor":[10]

> "**Realtor**.  Function:  *collective mark* - used for a real estate agent who is a member of the National Association of Realtors." Merriam-Webster's Collegiate Dictionary (2001), http://www.m-w.com/cgi-bin/dictionary

> "**Realtor** *trademark:*  a trademark for a member of the U.S. National Association of Realtors or the Canadian Association of Real Estate Boards."  Encarta® World English Dictionary [North American Edition]© & (P) 2001 Microsoft Corporation. http://dictionary.msn.com/find/entry.asp?search=Realtor.

> "**Realtor**.  A service mark used for a real-estate agent affiliated with the National Association of Realtors.  This service mark often occurs in print in lowercase and in the plural as well:  '*The economic aftershocks are already rippling through the area's non-defense businesses, from realtors to pizzerias*' (*New York Times*)."  The American Heritage Dictionary of the English Language 1456 (4th ed. 2000).

---

[10]    Affidavit of Nicholas G. De La Torre, Exhibits 71 – 73, 75 - 83.

"**Realtor**™ *n.* A member of the National Association of Realtors who works in the business of selling real estate; a real-estate agent. – *The Realtor showed the couple a nice house in an old neighborhood. I told the Realtor I wanted to buy a five-acre plot by the lake.*" NTC's American English Learner's Dictionary 734 (1998).

"**Re•al•tor** *collective mark* – used for a real estate agent who is a member of the National Association of Realtors." Webster's Third New International Dictionary 1891 (1993).

"**Re•al•tor** *n.* a realty broker who is a member of the National Association of Real Estate Boards: a trade name. Also re'al·tor." Funk & Wagnalls Standard Dictionary 658 (2nd Ed. 1993).

"**Re•al•tor**, *Trademark,* a person who works in the real-estate business and is a member of the National Association of Real Estate Boards, or one of its constituent boards, and abides-by its Code of Ethics." The Random House Dictionary Of The English Language 1607 (2nd Ed. 1987).

"**Re•al•tor**. A collective mark for a real-estate agent affiliated with the National Association of Realtors." Webster's II New Riverside University Dictionary 980 (1984).

"**Re•al•tor**, [coined by C.N. Chadbourn, of Minneapolis, a member of the National Association of Real Estate Boards, and formally adopted by the Association in 1916.] A broker or other individual in the real estate business who is an active member of the National Association of Real Estate Boards, subject to its rules and regulations. (Trademark.)" New Webster's Dictionary of The English Language 1246 (1981).

> "**Re•al•tor**  a real estate broker who is a member of the National Association of Real Estate Boards."  Webster's New World Dictionary of The American Language with Student Handbook 621 (Concise Ed. 1974).

> "**Re•al•tor**  *n* (US) person engaged in real estate business who is a member of the National Association of Real Estate Boards and subscribes to its standards of ethical conduct (GB = *estate agent*)."  Oxford Advanced Learner's Dictionary of Current English 700 (1974).

As noted earlier, the history of the coinage of the term drawn from the Oxford English Dictionary begins with Mr. Chadbourn's advocacy for making this a proprietary term.[11] In fact, the OED listing placed into the record by petitioner is consistent with the dictionary entries made a part of this record by respondent, reflecting the fact that in the United States, the term "Realtor" is a proprietary term:

> **Realtor**.  *U.S.*  Also realtor.  [f. REALT(Y + -OR.]  A proprietary term in the U.S. for a real-estate agent or broker who belongs to the National Association of Realtors (formerly the National Association of Real Estate Boards)….

---

[11]    See also New Webster's Dictionary of The English Language entry above, which goes on to observe that respondent's predecessor formally adopted this term in 1916.

Accordingly, we find that substantially all the dictionary definitions in the record recognize these terms as marks.

### (4)  Generic Use in the Media

In this category, petitioner points to what it characterizes as "overwhelming" evidence of generic usage in books, magazines, newspapers, encyclopedia and in court decisions.  Petitioner relies on an exhibit it refers to as its "newspaper survey" of contemporary usage.  Petitioner points to uses drawn from a randomly-chosen newspaper from each of twenty-four states:[12]

> HEADLINE:  "*Subdividing property can increase returns*"
>
> …
>
> Once subdivided, you have just increased your tax liability considerably.  Now you need to consider if you are going to advertise and market the lot yourself, or are you going to hire a **realtor** to market the lots and pay the commission fee.
>
> …
>
> *Daily News-Miner*, Fairbanks, Alaska, February 13, 2000.

---

[12]    Declaration of David Barry, Tab 41.  From an alphabetical listing of the fifty states at NewsDirectory.com, Mr. Barry selected every second state beginning with Alaska (excluding Delaware, which had only two newspapers, but neither of which offered a searchable, online archive).  Counsel then chose the third newspaper from the top of each state's listing, linked to that newspaper's homepage and searched the archives of the selected newspaper for stories containing the word "realtor." He then picked one story illustrating the use of the word "realtor."  These are the excerpts shown herein.

-oOo-

HEADLINE:  "*Nothing wrong with **Realtors***"
I have to admit that I was pretty angry when my friends started kidding me about the comments of my opponent in the city council race this fall.  For those who didn't read it firsthand, my opponent made the argument to your newspaper that I have a conflict of interest from serving on the city council because I am a **Realtor** and a lot of real estate zoning and planning issues come before the city council.

… Personally, I was disappointed that more people didn't try to participate in this election.  So, whether you're a plumber, a bus salesman, a **Realtor**, or a homemaker, be thinking about volunteering your time in a couple of years – and may the best ideas win!
*Log Cabin Democrat*, Conway, Arkansas, July 31, 2000.

-oOo-

HEADLINE:  "*Opening Shots*"
…
The Broncos drafted … during their early years.  So, how was it that they made center Roger LeClerc of Trinity College their first draft choice?  Dick Lyford, retired Denver **realtor** has the answer …
*The Denver Post*, Denver, Colorado, December 20, 2000.

-oOo-

HEADLINE:  "*For the Best Deal, Buy Out of Season*"
…
Julie Garton-Good is a licensed **Realtor** and a real estate educator, lecturer and author …

*- 21 -*

*The Miami Herald*, Miami, Florida, December 17, 2000.

-oOo-

HEADLINE:  "*Bishop's leasehold policies criticized:  But estate **Realtor** denies prices are out of line*"

…
While leasehold home values have plunged, that's because Hawaii's leasehold system is working like it's designed to – not because of anything Bishop Estate has done, said **Realtor** Peter Savio, who handles the trust's sale of residential leasehold land.
…
For leases that haven't been renegotiated yet, the estate is getting returns of 1 percent or less from rental income, yet it could be earning far greater returns in other, higher-yielding investments, said Mike Pang, a **Realtor** who specialized in leasehold issues …

*Star Bulletin*, Honolulu, Hawaii, (undated)

-oOo-

HEADLINE:  "*Disabilities Act addresses 'dignity issues'*"

…
And **Realtor** Charlene Smith noted that a fully accessible home she had listed recently brought two offers – neither from people with disabilities …

*Herald & Review*, Decatur, Illinois (undated)

-oOo-

HEADLINE:  "*Same genes, same profession*"
Judi McCoy used to get exasperated with her mother Marjorie Doud, a **Realtor** …

*Grand Rapids Gazette*, Grand Rapids, Iowa, January 18, 1995.

-oOo-

HEADLINE:  "*A little gray hair calls for respect?*"

> …
> Speaking of old things, a copy of an advertisement came into my possession courtesy of **Realtor** Richard Overby…

*The Gleaner*, Henderson, Kentucky, May 16, 1999.

-oOo-

HEADLINE:  "*Millennium memories in Lubec*"

> …
> Yet having briefly been highlighted on the national map, she says, might have something to do with the fact that real-estate brokers have been getting more calls than usual about properties in town.  One **realtor** told Preston that for the first time in 10 years she has run out of residential properties to list…

*Bangor Daily News*, Bangor, Maine, November 29, 2000.

-oOo-

HEADLINE:  "*The passion to own a home*"

> … I call Jones Town Country and make an appointment with **Realtor** Joyce Quinlin to see the house on Sunday…

*Daily Hampshire Gazette*, Northampton, Massachusetts, February 21, 2000.

-oOo-

HEADLINE:  "*Hires and Promotions*"

> [Ron] Tondryk is a licensed **realtor** with more than 15 years of sales experience …

*Duluth News-Tribune*, Duluth, Minnesota, December 21, 2000.

-oOo-

HEADLINE: "*PD on TV*"
KMOV anchor Myriam Wright and Post-Dispatch cultural news editor Robert Duffy explore what was good and what wasn't in St. Louis this year. Their guests are Kenny Buck, a Crossroads School sophomore, and Coldwell Banker **Realtor** Marti Frumhoff on "Imagine St. Louis."
*St. Louis Post Dispatch*, St. Louis, Missouri, December 23, 2000

-oOo-

HEADLINE: "*Sewer problem leads to demonstration*"
…
The only costs will be hooking up electrical pumps. The rest of the material and labor are donated as a chance to provide an educational opportunity for area plumbers, **Realtors**, homeowners and the general public…
*Grand Island Daily Independence*, Grand Island, Nebraska, June 4, 2000.

-oOo-

HEADLINE: "*Riding (Most of the Time) Trails Is Mountain of Fun*"
…
… Rounding out the field is Dan Vigneault – whose bike is etched with the scary legend "Downhill Dan" – and Rem Mastin, a **Realtor** and snowboard instructor …
*The Union Leader*, Manchester, New Hampshire, October 10, 1998.

-oOo-

… Keith Coulter, a Vineyard Estates resident and a **Realtor**, said he's frustrated with how long it has taken for the plan to be completed…

*- 24 -*

*Albuquerque Tribune*, Albuquerque, New Mexico, February 29, 2000.

-oOo-

HEADLINE: "*Realtor: There's no place like home*"

… As a **Realtor**, you'd expect Brock to have a lovely home…

*The Herald Sun*, Chapel Hill, North Carolina, August 13, 2000.

-oOo-

HEADLINE: "*Scorcher's plans to replace Corner in downtown Lorain*"

… The license is for "Kennedy's Broadway Billiards," although the building is still empty and bears a **realtor's** sign. The **realtor** did not return calls for comment yesterday…

*The Morning Journal*, Lorain, Ohio, December 20, 2000.

-oOo-

HEADLINE: "*Minding the store at St. Helens High means students running 9 businesses*"

… The construction company is scheduled to finish building a 2,800-square-foot, five-bedroom, three-bathroom house in Columbia City by May. **Realtor** Molly Womack of Prudential Northwest Properties, who is working with the school, plans to list the house for $239,000. Any profits would be used to build the next house…

*The Oregonian*, Portland, Oregon, March 19, 2000.

-oOo-

HEADLINE:   "*Library hits the road Sept. 6*"
… The trustees voted unanimously Aug. 9 to lease [Cherry Webb & Touraine] from **realtor** Matthew LaCroix for $8,000 per month for the duration of the project, which is expected to last about a year…
*The Woonsocket Call*, Woonsocket, Rhode Island, August 22, 2000.

-oOo-

HEADLINE:   "*Developer eyes Marr's Beach*"
A purchase contract has been entered into between John Egan, Sioux Falls developer/**realtor**, and Maurice Beyer, owner of Marr's Beach on Lake Madison…
*Madison Daily Leader*, Madison, South Dakota, July 14, 2000.

-oOo-

HEADLINE:   "*Volunteer Center hits right note with Jazz Fest*"
…The high-profile wait staff will include Plano Mayor Jeran Akers and Councilmen Steve Stovall and John Roach Jr.; … attorney Glenn Callison, **Realtors** Ed Bujko and Steve Russell and the inimitable Johnny Rutledge…

*Plano Star Courier*, Plano, Texas, November 3, 2000.

-oOo-

HEADLINE:   "*Buy a house and support an industry*"
… So I called our Realtor and said: "We need to move." …
*Rutland Herald*, Rutland, Vermont, August 6, 2000.

-oOo-

HEADLINE: *"Municipal League grows desperate for volunteers"*
…Of the 39 races county-wide, 26 are split evenly between South County and the Eastside, Culver said every tiny faction already scores candidates: **Realtors**, unions, gun rights advocates, property rights advocates, anti-gun groups, bicyclists and trail users…
*South County Journal*, Seattle, Washington, July 15, 2000.

-oOo-

… The proposal was brought by majority landowner Kevin Dittmar, **Realtor** and member of Rubicon Associates, to construct a 122-unit mixed-residential-use subdivision across the highway from Pike Lake State Park…
*Daily Citizen*, Beaver Dam, Wisconsin, November 29, 2000.

While one should not place determinative weight upon whether or not the journalists and editors involved in these randomly-selected newspaper articles use an upper-case or lower-case letter "R," we find it instructive that in a majority of these instances, the word "Realtor" is capitalized and used in a manner consistent with respondent's position that this term functions as an identifier for its members – not as a generic designation for all real estate agents. Respondent also points to many instances in the record where newspapers and magazines

clearly use the term "Realtor" in a manner consistent with the proprietary nature of the term.[13]

Petitioner argues in its brief that "the coinage of [the word] realtor was obvious and probably inevitable." Given the etymology of the word as shown in the Oxford English Dictionary, the word "Realtor" may well have been one of several logical naming choices for the professional involved in "realty." We recognize the aural and visual similarities as well as the etymological links between the ordinary, English-language words "realty" and the term "Realtor." However, notwithstanding the challenges faced by respondent and its predecessor in fostering recognition of the "Realtor marks," the record suggests that respondent, its affiliated organizations and its individual members have generally succeeded in educating editors, journalists and some portion of the public at large. The evidence establishes aggressive marketing of these marks and constant policing of media usage of these terms, supporting respondent's position that it has preserved for the term no small degree of proprietary meaning, even among general news outlets.

---

[13] Affidavit of Nicholas G. De La Torre, Exhibit 90.

Finally, petitioner places a great deal of emphasis on what appear to be generic uses by federal court judges, including Justices of the Supreme Court. We recognize that among the innumerable reported federal decisions issued over the past eighty-plus years, there are indeed scattered legal opinions, dealing with totally different issues, wherein the term "realtor" appears to be used to refer to real estate agents generally. Nonetheless, we find it plausible that on occasion even federal jurists may have been less than precise in their usage of these collective service marks, particularly when focused on substantive matters unrelated to whether these terms are source indicators. Moreover, given their limited circulation among members of the public, unlike the articles of general circulation discussed above, these legal opinions will likely have little impact upon the public's understanding of the "Realtor" or "Realtors" terms.

**(5)  Testimony of Persons in the Trade**

The uncontroverted affidavits of Michael F. Thiel and Clifford D. Niersbach stand for the proposition that respondent, through its licensing relationships, its by-laws, Code of Ethics, Standards of Practice and other guidance, intends to preserve the proprietary functions of

these terms.  Petitioner put forward no testimony from
other persons involved in the field of real estate to
undermine this testimony or otherwise demonstrate the
genericness of these terms.

### (6)  Consumer Surveys

In the most contentious area of evidence in this
record, the parties to these proceedings have each
proffered a survey.  They appear to reach diametrically
opposite results on the question of genericness, and each
party has criticized the survey conducted by its opponent.

In short, petitioner points to a telephone brand
awareness survey conducted over a two-week period in the
summer of 1999.  The survey targeted individuals who had
consulted a real estate agent in the past year or were
planning to do so in the coming year, or were planning to
buy, sell or rent real estate in the next year.  Of the
ninety-six individuals surveyed, only ten percent said that
"Realtor" was a brand name.

By contrast, respondent's telephone survey targeted
real estate brokers and agents.  Respondent argues that
real estate professionals make up the proper survey
universe, as they are actually the purchasers or
prospective purchasers of membership in respondent and the

services provided by respondent.  According to the results of this survey, the primary significance of the term "Realtor" is that of a proprietary term indicating association with respondent – not a generic word. Specifically, when asked whether "Realtor" refers to all real estate agents or only those who are members of respondent or one of its local or state associations, 84.3% of 204 individuals surveyed recognized this term as indicating members of respondent or one of its associations.[14]

Moreover, respondent argues that even if we were to determine that the relevant universe must include members of the general public, because the term is such a strong source indicator in the eyes of real estate professionals, this showing is more than sufficient to justify the continued existence of its registrations.

We turn then to a detailed examination of the two proffered surveys.

Petitioner's attorney contacted Dr. Michael Sullivan, a principal with the consulting firm of Freeman & Sullivan,

---

[14]    Taking the position the respondent was measuring perceptions of this term in the wrong market, petitioner objects to this entire survey and the Ross declaration as irrelevant. However, petitioner does not criticize the methodology of the study, the form of the key question, etc.

and instructed him to do a "Teflon survey."  Although Dr.
Sullivan had never before designed a survey for use in
trademark litigation, it is clear from the record that he
devoted less than six hours to this project over the
critical four-month period of this study.

Respondent has severely criticized the Sullivan study.
Respondent's survey expert, Dr. Jacob Jacoby, drew on his
own professional expertise and referred to other academic
sources as well as guidance from the Handbook of
Recommended Procedures for the Trial of Protracted Cases,
25 F.R.D. 399-403, in support of his criticisms of
petitioner's study.  Totally apart from the question of
whether petitioner has selected the proper universe for
this survey, we find that many of respondent's criticisms
of this survey are valid, including, but not limited to,
the following:

- The low response rate (~10%) negatively affects the reliability of the survey, as the sample may well no longer be representative of the relevant consuming universe.
- The final number of survey subjects (96) was too low to accord much weight to the study results.
- The gate-keeping queries deviated from the "Teflon" format in ways that render the answers meaningless in ensuring understanding on the part of the survey subjects.[15]

---

[15]    The gate-keeping questions in a genericness survey are designed to determine whether the survey participant understands the difference between "brand names" and "common names."

- Orienting the survey subjects to the concept of "brand names" and giving them examples of well-known brands and trade names before asking them to categorize a collective mark was misleading.
- The failure to provide survey subjects with a "don't know" option forced guessing or choosing an option by default.

Accordingly, given all the deficiencies of petitioner's survey, we accord it very little weight on the question of whether prospective purchasers of a real estate professional's service would view the term "Realtor" as indicating the services were being offered by a real estate association member (even if the association were unknown).

Respondent's counsel retained Dr. Ivan Ross to conduct a survey to determine the significance of the term "Realtor." Dr. Ross determined that the relevant universe for this "double blind" survey was full-time licensed real estate agents or brokers who operate from real estate offices in the continental United States and who had been licensed for at least one year. His rationale for

---

In this flawed survey, rather than actually testing the survey participant's specific understanding of 'whether Chevrolet is a brand name or a common name?' (the "Teflon" format), after providing some "training," the question asked was "Do you understand the difference between 'brand names' and 'common names?'" According to Dr. Jacoby, this is a leading question calling for a "yea-saying" response and is not a reliable measurement of comprehension. Furthermore, a yes answer to either of two questions qualified one for the survey. Declaration of Jacob Jacoby, Ph.D., ¶45.

selecting this universe was "that the significance of the term REALTOR is most appropriately measured among individuals who are qualified for membership in professional real estate associations and are 'prospective purchasers' of membership in such associations."

After qualifying the survey subjects, two questions followed and were rotated. The answers to the key question were of primary interest to the survey sponsor while the other question was a control question designed to eliminate "noise."[16] For the question of primary interest, 86.3% of the survey subjects believed that the term REALTOR refers only to real estate agents who are members of NAR or one of its local or state associations, while 6.4% believed that the term REALTOR refers to all real estate agents.

Other than arguing that the Ross survey measured perceptions of the "Realtor marks" among the wrong population, and arguing that Dr. Jacoby was too "biased" for us to accord his testimony much weight, petitioner has not taken issue with the methodologies employed in the Ross

---

[16] Because a control question generally has a correct answer, the magnitude of survey participants who fail on a control question (the "noise") will be viewed as evidence of guessing, inattention and/or other extraneous factors, and will be used to adjust the percentages of answers to the key question in order to get an accurate measurement of the "true" beliefs within the population about the key question. Declaration of Ivan Ross, Ph.D., ¶17.

study.   Indeed, we find that the Ross survey appears to comport with all the standards for admissibility reflected in the Handbook of Recommended Procedures for the Trial of Protracted Cases, 25 F.R.D. 399-403.   We find that the results of this survey demonstrate rather convincingly that among real estate professionals, the "Realtor" marks are perceived as strong source indicators.

We need not agree with respondent that real estate professionals are the sole group with whose perceptions we should be concerned in order to accord substantial weight to the results of the Ross survey.   For given the circumstances of the use of these collective service marks, we agree with respondent's fallback position that real estate professionals make up a significant subgroup of relevant consumers.   Even petitioner's survey expert testified that he presumed that people in the real estate industry would be likely to identify the term "Realtor" as a mark.[17]   In fact, the Ross survey confirms that among this key group, an overwhelming majority perceives the term "Realtor" as a strong source identifier.

---

[17]   A review of Ms. Freeman's testimony depositions from the earlier proceedings reveals a number of instances where she too acknowledged the significance of the "Realtor marks" among real estate professionals.

Moreover, respondent argues throughout the prosecution of these proceedings that whether a real estate agent or broker is a member of respondent is a material issue to other agents or brokers:

> As used, the marks serve to distinguish NAR and its member associations from competing service providers and real estate associations that are not affiliated with NAR. Moreover, the marks enable real estate agents and brokers to determine whether their peers, with whom they deal regularly in connection with real estate transactions, are or are not members of NAR. This is important to transactional efficiency and the smooth functioning of the marketplace because … NAR members are obligated to abide by a Code of Ethics and established rules and regulations that do not apply to non-members.

(Respondent's brief, p. 5)

Hence, in the channels of trade where goods and/or services are directed at the population subset of real estate agents and brokers, it is clear that these terms continue to function as source-identifying indicators.

On the other hand, we agree with petitioner that members of the general public seeking real estate services from an association professional are within the relevant public. The results of petitioner's flawed survey suggest that members of this portion of the relevant public may perceive the terms involved in these proceedings as generic

terms in spite of respondent's best efforts to create perceptions of these terms as source indicators among members of the general public. However, because of the flawed methodology, these results do not factor into our decision. Rather, we find that petitioner has not shown by a preponderance of the evidence, that the terms are perceived as generic by even a significant minority of purchasers of a real estate professional's services.

Had petitioner conducted a proper survey, and obtained similar results, we would clearly face a situation with parallels to the facts of the oft-cited *Bayer* case, *supra* – a case cited with favor by petitioner in its reply brief.

In *Bayer*, Judge Learned Hand observed that case "presents a situation in which … the trade is divided into two classes, separated by vital differences."[18] Moreover,

---

[18] Here, as in the *Bayer* case, a single term may be found to function as a "hybrid," i.e., a trademark and a generic term for the same goods or service, depending upon whether one is a member of the class of knowledgeable intermediaries or a member of the general public. The professional class in the *Bayer* case included retail pharmacists, and it was in these wholesale channels of trade where Bayer was permitted to retain the trademark status of the term "Aspirin."

In the *Bayer* case, ordinary consumers were not free to enter into the marketplace reserved for pharmacists and physicians. Similarly, here, consumers needing the services of a real estate agent or broker are not free to enter into the world of the real estate professional. Like the pharmacists and physicians in *Bayer*, the real estate professionals herein – whether or not they are members of respondent – have at their ready disposal the generic identifier to which they are most accustomed.

to the extent some factors in the instant case vary from those in the *Bayer* case, these differences tend to support the position of respondent. For example, while the evidence in the *Bayer* case led the Court to conclude that substantially all of the general consuming public considered "aspirin" to be a generic designation, we have no reliable evidence showing that such is the case herein. More importantly, while members of the general public in the *Bayer* case had no memorable generic alternative, such is not the case here. The record suggests that "realty agent," "real estate agent" or "real estate broker" are accepted generic alternatives. Moreover, Bayer's own actions were partly to blame for the state of affairs in the *Bayer* case, while the record herein shows no period of misuse by NAR, the trademark owner.[19]

Finally, in the *Bayer* case, Judge Hand issued a split injunction as a way of accommodating the members of both groups – including the interests of the brand name users.

---

*See also* "Distinct Classes of Consumers of a Single Product – Accommodating Competing Perceptions of Genericness of the Same Identification," Jonathan Bersade, *The Trademark Reporter*, 86 T.M.R. 56 (1996).

[19] *See* "Distinct Classes of Consumers of a Single Product – Accommodating Competing Perceptions of Genericness of the Same Identification," Jonathan Bersade, *The Trademark Reporter*, 86 T.M.R. 56 (1996).

The Board does not issue injunctions, and Board decisions are restricted to the issue of registrability.

Against this backdrop, we find that this record supports a decision protecting the critical interests of the users of these marks within the real estate community. When real estate professionals see and use these identifiers, an entire packet of information is succinctly conveyed among them. Hence, they should be permitted to continue making knowledgeable and informed decisions based on the source-indicating functions of these marks. We find that this result is entirely consistent with the holding in the *Bayer* case.[20] Furthermore, there is insufficient probative evidence in this record on which we could base a finding as to the perceptions of the "Realtor marks" among members of the general public.

Accordingly, based upon all the evidence in this record, we find that the marks REALTOR and REALTORS continue to function as collective service marks and have not become generic terms.

*Decision*: The petitions to cancel are denied.

---

[20] *Id.*